UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

STEVEN MALLOCH,

                Petitioner,

                v.                           CAUSE NO.: 1:24-CV-86-HAB-SLC

INDIANA ATTORNEY GENERAL,

                Respondent.

<u>OPINION AND ORDER</u>

Steven Malloch, a prisoner without a lawyer, filed a habeas corpus petition

challenging his 2012 child molestation conviction in DeKalb County under case number

17D02-1001-FA-00002. (ECF 1.) For the reasons stated below, the petition is denied.

I.      BACKGROUND

In deciding the petition, the court must presume the facts set forth by the state

courts are correct unless Malloch rebuts this presumption with clear and convincing

evidence. 28 U.S.C. § 2254(e)(1). On direct appeal, the Indiana Court of Appeals set forth

the facts underlying Malloch's conviction as follows:

> In 1998, Malloch began living with Anita Malloch and her four-year-old
> daughter C.P., who was born in 1993. Malloch and Anita married in 1999
> and subsequently had three sons. C.P. had regular parenting time with
> her biological father but primarily lived in the Malloch home. She called
> Malloch "Dad."
>
> In 2003 and 2004, when C.P. was in fourth grade, the family lived in
> Auburn, Indiana, next to a cemetery. C.P. was sometimes scared at night
> because of the cemetery and would ask Anita or Malloch to lie down with
> her. On one occasion when Malloch lay with C.P., she awoke with his
> hand underneath her shirt on her breast. Malloch appeared to be asleep.

C.P. removed his hand, rolled over, and went back to sleep. She never talked with him about the incident.

In June 2004, the family moved to a ten-acre property in Garrett, Indiana. They lived in a small apartment in a barn until March 2005, when construction of their house was completed. At some point while they lived in the barn, C.P. watched a werewolf movie and was scared to go to bed. She first asked Anita to lie down with her, but when Anita told her she was busy, she asked Malloch. C.P. fell asleep in her bed with Malloch beside her. When she woke up, Malloch's hand was in her underwear and his finger was in her vagina. Again, Malloch appeared to be asleep. C.P. pulled his hand out of her pants, crawled over him, and slept with her then-six-year-old brother in his bed. The next morning, Malloch asked C.P. why she ended up in her brother's bed. C.P. answered, "[B]ecause." She never asked him to lie down with her again.

At some point while the family still lived in the barn, Anita watched an episode of "Dr. Phil" about child molesting and asked C.P. whether she had ever been touched. C.P. told Anita what had happened with Malloch. When Anita confronted Malloch, he claimed that he did not know what Anita was talking about and that if anything had happened, it had happened while he was asleep.

Roughly five years later, Anita told her counselor about the two incidents. On January 22, 2010, Anita's counselor reported the matter to Jennifer Hupfer, a caseworker for the Department of Child Services, who in turn notified Detective Donald Lauer of the DeKalb County Sheriff's Department. Later that day, Hupfer and Detective Lauer went to the Malloch home and informed Malloch of the allegations. Malloch said he was asleep and woke up to find his finger in C.P.'s vagina. He agreed to go to the Sheriff's Department for a formal interview and drove himself there.

*Malloch v. State*, 980 N.E.2d 887, 892-93 (Ind. Ct. App. Dec. 21, 2012) (internal citations

omitted).

Detective Lauer conducted two interviews of Malloch as part of his investigation.

*Id.* He gave him *Miranda* warnings at both interviews. *Id.* at 893, 896. During the first

interview, Malloch maintained that he was sleeping during this incident. *Id.* at 893.

However, as the interview progressed he admitted to having sexual thoughts about C.P., stating: "I mean, she's a pretty girl, and, you know—and she walks around in—in her underwear at times, and stuff like that, but I—I'm always like, 'Put your clothes'— you know, 'Get clothes on,' I—you know, that 'You don't need to be doing that.' " *Id.* He stated that he would "suppress the thought" and say to himself, "That's not right." *Id.* at 894.

Later in the interview, he admitted to a prior incident in which C.P., then in third or fourth grade, was sleeping next to him and he knowingly put his hand under her shirt and touched her breast. *Id.* The following exchange occurred:

DETECTIVE: So, what I want to know, I guess, is—is—I mean, I can just keep babbling here, but I need to know what's going on—what was going on in your head when that happened., And, you were awake, don't tell me you—because, you—you—

MR. MALLOCH: I—I—the hand in the shirt, yes. . . . I—with the hand thing, it was a—I mean, does she have boobs, kind of a thing, you know, at—at this age, and—

DETECTIVE: So, you were curious if she had breasts, or—

MR. MALLOCH: Yeah.

*Id.* At another point he made a statement admitting he was awake when he put his finger in C.P.'s vagina: "I laid down with her, and woke up, put my hand down her pants, realized it was wrong, pulled my hand out, and she woke up at that point and kicked me out of bed." *Id.* at 896. Later he back-tracked from this statement, again stating that he had been asleep and woke to find his finger in C.P.'s vagina. *Id.* At the conclusion of the interview, Detective Lauer arrested him and walked him over to the jail, where he was processed by a jail officer and placed in a holding cell. *Id.*

After being in a cell for approximately four hours, he asked to speak with Detective Lauer. *Id.* Detective Lauer was called and returned to the police station. A second interview was then held, and Detective Lauer gave Malloch another *Miranda* warning. *Id.* As soon as the interview was underway Malloch admitted to having "not good thoughts" about C.P. for several years. *Id.* He also admitted that he knew what he was doing when he put his finger in her vagina. *Id.* He stated, "I didn't want to hurt her, she happened to be asleep, and I failed to control myself." *Id.* He expressed remorse for what had happened and stated: "I remember—yeah, laying down—falling asleep, waking up, and this has come to me as I'm laying out there, put my—curious, or whatever, put my hand down there, she stirred, pulled my hand out, and then had gotten kicked out of the bed." *Id.* at 897. Detective Lauer asked him if he wanted to write C.P. an apology letter and he stated that he did. *Id.* In the letter he wrote: "I am so sorry for what I did to you. At the wedding I promised to protect you, and I failed at those times. . . I will seek professional help for what has happened and make sure it never happens again." (ECF 7-4 at 163.)

The State charged him with child molesting. *Malloch*, 980 N.E.2d at 897. The case proceeded to trial in June 2011, but the jury deadlocked. *Id.* The court declared a mistrial and scheduled a second jury trial for September 2011. *Id.* At the second trial, Malloch's defense was that he suffered from "sexsomnia," a disorder that caused him to engage in sexual behavior while he was asleep; he claimed he was asleep when he put his finger in C.P.'s vagina and that his inculpatory statements to Detective Lauer had

been coerced. *Id.* The jury found him guilty, and the trial court sentenced him to 28 years in prison with a portion of that time suspended to probation.[1] *Id.*

On direct appeal, Malloch raised the following arguments: (1) the court abused its discretion in denying his motion for a continuance of the second trial so that he could present testimony from an expert on sexsomnia; (2) the court erred in admitting his inculpatory statements to Detective Lauer because the *Miranda* warnings he received were inadequate and his statements were involuntary; (3) the court erred in admitting his apology letter to C.P. because it was coerced by Detective Lauer; and (4) the prosecutor committed misconduct through comments she made at *voir dire*, during her cross-examination of Malloch's wife, and during closing arguments. *Id.* at 897-910. The Indiana Court of Appeals rejected these arguments and affirmed his conviction in all respects. *Id.* He sought transfer to the Indiana Supreme Court asserting one argument: that his inculpatory statements to Detective Lauer were involuntary. (ECF 4-7 at 5.) The Indiana Supreme Court denied transfer without comment. *Malloch v. State*, 984 N.E.2d 1253 (Table) (Ind. 2013).

In January 2014, he filed a petition for state post-conviction relief raising claims of ineffective-assistance of trial counsel. *Malloch v. State*, 223 N.E.3d 683, 694 (Ind. Ct. App. 2023). The court held a two-day evidentiary hearing at which Malloch was represented by retained counsel and several witnesses testified, including an expert on

---

[1] He has completed his prison sentence but is still on probation. He thus satisfies the "in custody" requirement for seeking federal habeas relief. *Virsnieks v. Smith*, 521 F.3d 707, 717 (7th Cir. 2008).

parasomnia disorders, an expert on false confessions, and Malloch's trial attorney, John

Bohdan. *Id.* The petition was denied. *Id.* at 696.

On appeal, he presented two claims based on Attorney Bohdan's performance:

(1) counsel was ineffective in failing to present expert testimony about false confessions;

and (2) counsel was ineffective in failing to present expert testimony about sexsomnia.

*Id.* at 685. The court rejected these claims and affirmed the denial of post-conviction

relief. *Id.* at 701. Malloch raised these same two claims in a petition to transfer to the

Indiana Supreme Court (ECF 4-14), which was denied without comment. *Malloch v.*

*State*, 230 N.E.3d 885 (Ind. 2024). He did not seek relief in the U.S. Supreme Court. (ECF

1 at 1.)

He then turned to federal court. In his federal petition he raises the following

claims: (1) his inculpatory statements to Detective Lauer were "involuntary and

coerced"; (2) Attorney Bohdan was ineffective in failing to present expert testimony on

sexsomnia and false confessions, in failing to "explore possible juror bias," and in

failing to object to comments made by the prosecutor; (3) he was denied his right to

counsel at the second interview with Detective Lauer; and (4) he was denied a fair trial

due to "gross juror misconduct." (ECF 1 at 3-4.) The Respondent argues that these

claims are procedurally defaulted and/or fail on the merits. (ECF 4.) Malloch filed a

traverse arguing that he meets the standard for obtaining federal habeas relief. (ECF 17.)

II.   ANALYSIS

The petition is governed by the provisions of the Anti-Terrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), which allows a district court to issue a writ of

habeas corpus "only on the ground that [the petitioner] is in custody in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Habeas corpus

was intended as a "guard against extreme malfunctions in the state criminal justice

systems, not a substitute for ordinary error correction through appeal." *Gilbreath v.*

*Winkleski*, 21 F.4th 965, 981 (7th Cir. 2021) (citation and quotation marks omitted). The

court can grant an application for habeas relief if it meets the stringent requirements of

28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

This standard is "difficult to meet" and "highly deferential." *Hoglund v. Neal*, 959

F.3d 819, 832 (7th Cir. 2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "It is

not enough for a petitioner to show the state court's application of federal law was

incorrect; rather, he must show the application was unreasonable, which is a

'substantially higher threshold.'" *Hoglund*, 959 F.3d at 832 (quoting *Schriro v. Landrigan*,

550 U.S. 465, 473 (2007)). In effect, "[a] petitioner must show that the state court's ruling

on the claim being presented in federal court was so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility

for fair-minded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A.      Voluntariness of His Confession

Malloch first claims that his statements to Detective Lauer in which he admitted to knowingly inserting his finger in C.P.'s vagina were coerced in violation of the Fifth Amendment. (ECF 1 at 3.) The Respondent argues that this claim fails on the merits. (ECF 4 at 19-25.)

The Fifth Amendment privilege against self-incrimination prohibits the use of an accused's statement to police that was not voluntarily made. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "[A] person arguing his confession was involuntary must show that the police engaged in coercive practices." *Dassey v. Dittmann*, 877 F.3d 297, 303–04 (7th Cir. 2017) (citing *Colorado v. Connelly*, 479 U.S. 157, 164–65 (1986)). "Physically abusive interrogation tactics" meet this standard, as do "tactics designed to exhaust suspects physically and mentally," such as "long interrogation sessions or prolonged detention paired with repeated but relatively short questioning." *Id.* (citations omitted).

"The evaluation of whether a confession is coerced involves consideration of the totality of the circumstances to determine whether the suspect confessed voluntarily, of his own free will, or whether the police overrode his volition." *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018). The totality of the circumstances includes "both the characteristics of the accused and the nature of the interrogation." *Schneckloth*, 412 U.S. at 226. The court should consider such factors as the suspect's age, intelligence, education, and familiarity with the criminal justice system, *Fare v. Michael C.*, 442 U.S.

707, 725–26 (1979), as well as "the length of the defendant's detention, the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *United States v. Montgomery*, 555 F.3d 623, 632 (7th Cir. 2009).

Malloch argues that his inculpatory statements were involuntary because Detective Lauer "persuaded, tricked, and cajoled [him] into giving a confession." (ECF 1 at 3.) In rejecting this argument on direct appeal, the Indiana Court of Appeals set forth additional facts surrounding Detective Lauer's interrogation of Malloch. These facts are presumed correct in this proceeding unless Malloch rebuts them with clear and convincing evidence:

> Detective Lauer conducted two interviews with Malloch in his office. Before the first interview, Detective Lauer read Malloch his Miranda rights, and Malloch indicated that he understood them, had no questions about them, and wished to talk. During this interview, Detective Lauer employed the two-part Reid Technique, which he later described at trial as the "gold standard of . . . police interviewing." The first phase of the Reid Technique consists of nonaccusatory questioning. The interview then shifts to the second phase, where the questioner does most of the talking and claims that the investigation clearly shows that the suspect committed the crime. A questioner using the Reid Technique introduces "different minimizing themes," in essence excuses or justifications, to make it easier and more comfortable for the suspect to admit to the crime.
>
> In the first phase here, Detective Lauer explained that his job was to separate the "small percentage of people . . . who prey on people" from "average good guys, like you and me, who make a mistake . . . and . . . accept responsibility." Malloch told Detective Lauer he was in bed with C.P. because she was scared, he woke to find his hand in her pants and his finger in her vagina, he pulled his hand out, and C.P. kicked him off the bed. He also admitted to the earlier incident, when his hand was underneath C.P.'s shirt on her breast, but claimed that he had woken up that way and thought she was asleep when he got up and went to his room.

Detective Lauer said he had to determine whether Malloch was asleep or not and whether he was a "bad guy" or "not so bad guy." Malloch claimed he was being honest. Detective Lauer then asked if he had ever had sexual thoughts about C.P. Malloch responded, "No . . . . I mean, she's a pretty girl, and, you know—and she walks around in—in her underwear at times, and stuff like that, but I—I'm always like, 'Put your clothes'—you know, 'Get clothes on,' I—you know, that 'You don't need to be doing that.' " Detective Lauer asked Malloch about a polygraph test, and Malloch responded that he would be willing to take the test. Malloch said he felt responsible for the incidents because he was the adult and being asleep was not an excuse.

Detective Lauer then said C.P. had told him that at some point she was "sitting downstairs like in her underwear and bra and stuff, kind of inappropriate, I think, I mean she shouldn't of [sic] been doing that, I guess, I mean that's on—that's on her, I mean, she should ... know better than to ... be doing that." Malloch later offered, "I would suppress the thought. You know, if—see her standing at the sink, or whatever, kind of a thing, you know, I—I would throw it out of my mind, I would say 'That's not right,' you know." Malloch explained how he would walk away from the situation and offered this vignette: "[T]wo months ago, or something, walking upstairs, to go to bed, and [C.P.]'s door is cracked, and she was standing there taking off her shirt, and I mean, I saw her breasts, but then I went to my room."

Detective Lauer asked whether, assuming Malloch was awake, it was "kind of just a spur of the moment type thing, or—some guys actually will sit and plot out a way[.] . . . . I call those people . . . . the one percenters, those luckily are the—the people that are few and far between." Malloch claimed it would have been spur of the moment. Detective Lauer then left the room. This portion of the interview was about thirty minutes. When Detective Lauer returned, he sat closer to Malloch and said, "[M]y investigation clearly shows that you touched her, and you were awake when you did that, this was a conscious thing that you did." Malloch said that he woke up to it, but Detective Lauer said: No, you were awake when you did it, . . . that was a conscious thing, . . . you were awake when you did that. Now, what I need to find out is certain other things like, was this a spur of the moment thing, you know, and that's what we need to talk about, because, like I said, I've got to figure out what kind of guy is Steve. Detective Lauer offered many minimizing themes, including that it was good that the incidents occurred when C.P. was asleep because maybe she would not remember what happened, that C.P. was a pretty girl and was

"walking around half naked," that Malloch was a guy and was "gonna have those thoughts," that maybe there were "tough things going on" in Malloch's life at the time, and that maybe his wife "turned off the faucet and there wasn't any, you know, sexual activity or something." Malloch admitted that he was awake when he put his hand on C.P.'s breast:

DETECTIVE: So, what I want to know, I guess, is—is—I mean, I can just keep babbling here, but I need to know what's going on—what was going on in your head when that happened., And, you were awake, don't tell me you—because, you—you—

MR. MALLOCH: I—I—the hand in the shirt, yes.

Malloch claimed he touched C.P.'s breast to see if she was developing and said he was not sure if he was awake when he put his finger in her vagina:

MR. MALLOCH: I—with the hand thing, it was a—I mean, does she have boobs, kind of a thin[g], you know, at—at this age, and—

DETECTIVE: So, you were curious if she had breasts, or—

MR. MALLOCH: Yeah.

DETECTIVE: What about the hands in the pants thing? You were not asleep.

MR. MALLOCH: Okay, maybe I was—I—

DETECTIVE: There's no "maybe"—

MR. MALLOCH: No, no—

DETECTIVE: —you were either awake, you weren't awake, that—I don't want to dance around playing this game.

Later on, Detective Lauer asked Malloch how long his finger was in C.P.'s vagina, which led to Malloch saying for the first time that he was awake at the time, but which he then appeared to take back:

DETECTIVE: How long was your finger inside of her?

MR. MALLOCH: Two seconds, three seconds.

11

DETECTIVE: Okay. And, how do you know that?

MR. MALLOCH: I just—well, I mean, because I—when I—I still believe that I woke up from it. I—I understand you don't believe it, but—and—and, I don't know how I need-how I get that—or, how I get it out of myself, that I wasn't asleep.

DETECTIVE: Maybe you've tried to convince yourself all these years that you—you were (sic) awake, that was a conscious decision. That doesn't happen—that doesn't happen.

MR. MALLOCH: It happens to my wife, or with me and my wife.

DETECTIVE: I've talked to your wife. It doesn't happen in your sleep. Your wife doesn't believe it. I mean, I'm sorry to tell you that—that she doesn't. Nobody's gonna believe that—that story. And, what that—what that shows is, a young man unwilling to accept responsibility, that's what that says to me, that's what I recognize. And, all I want you to do here is tell the truth.

MR. MALLOCH: Okay.

DETECTIVE: That's all I want, is the truth. And—and we investigate—

MR. MALLOCH: I laid down with her, and after she was asleep for a while, put my hand down her pants and touched her.

DETECTIVE: And, how long did you do that?

MR. MALLOCH: A few seconds.

DETECTIVE: Why just a few seconds?

MR. MALLOCH: Because, I—reality kicked in.

DETECTIVE: Was it that you woke up?

MR. MALLOCH: Well, see that's what—

DETECTIVE: Yeah, I—I think you're just playing games here.

MR. MALLOCH: Well, I—

12

DETECTIVE: I'm not trying—I'm not trying to tell you—

MR. MALLOCH:—you're trying to tell me what I need to say.

DETECTIVE: No, I'm not tell—I will not tell you what to say. I am telling you, tell the truth.

Malloch claimed he was telling the truth. Detective Lauer stated that he had to determine whether Malloch was a pedophile or a pervert or whether he was a guy who made a mistake. When Malloch continued to say he was asleep, Detective Lauer called the claim "hogwash." He also said that Malloch was "not man enough to accept responsibility." Soon after, Detective Lauer told Malloch he could tell his story to a jury, and Malloch admitted for a second time that he was awake when he put his finger in C.P.'s vagina:

DETECTIVE: That may be what you've tried to convince yourself all this time, but—and, I'll tell you what, Steve, I'm not gonna spend much more time here listen—listening to this, because I will just arrest you and you can go into court and you can tell 12 people—first of all, you can make your daughter get up and testify against you, and then you can tell 12 people, 'Yes, I was sleeping, and I woke up, and my hand was inside her vagina. Oh, and by the way, I also stuck my hand up her shirt to make sure she had breasts.'

MR. MALLOCH: And, so I laid down with her, and woke up, put my hand down her pants, realized it was wrong, pulled my hand out, and she woke up at that point and kicked me out of bed.

DETECTIVE: Is that true, or are you just trying to—I want to know what the truth is. I don't want to put words in your mouth, I want to hear you tell me what happened, what was going through your head when that happened. Because, that's what's important, what's going on up here—

MR. MALLOCH: Right.

DETECTIVE: —and what's going on right now are the important things. Whether you're man enough to accept responsibility, and show a judge that you're remorseful, and how you show remorseful is by saying, 'Yes, this is what I did, it's never gonna happen again, I learned my lesson.'

However, Malloch later indicated that he was asleep: "I remember laying down, with my back to her, and I remember waking up, pulling my hand

out of her pants, and getting kicked on to the floor, and then getting into my bed. I can't remember the—initiating it. I cannot remember that."

When Malloch continued to insist that he could not remember consciously putting his finger in C.P.'s vagina, Detective Lauer said, "You know why you can't remember it . . .  it's dawning on me now, because you're one of the one percenter guys." He also said, "You don't have the stones to say it, that's the problem." At the conclusion of the interview, Detective Lauer arrested Malloch and told him he would come back in if Malloch wanted to talk further. The entire first interview was about an hour and twenty-five minutes.

Detective Lauer turned Malloch over to Jeremy Heffelfinger, the intake officer, and had nothing to do with where he was placed in the jail. It took about an hour for Malloch to go through the intake process and make a phone call. Heffelfinger then placed Malloch twenty feet from his desk in a cell with Jeffrey Cain, an accused murderer. Heffelfinger placed Malloch there so he could monitor any shock Malloch might have from being in jail for the first time and being charged with a severe crime. It was also the only available space. Although one other holding cell had just one man in it, that person was a trouble maker, which was in stark contrast to Cain, who had never caused any problems in the year and a half that he was at the jail.

Heffelfinger monitored Malloch the entire time he was in the cell. He did not notice any problems or tension between Malloch and Cain, and neither inmate indicated there were any problems. About four hours after Malloch's first interview ended, Cain got Heffelfinger's attention and said that Malloch wanted to speak with him. Malloch asked to speak with Detective Lauer.

Malloch was escorted out of the jail and back to Detective Lauer's office. Detective Lauer again read Malloch his Miranda rights, and Malloch indicated that he understood them. Malloch then asked if he was "best advised to speak to a lawyer." Detective Lauer said that it was Malloch's decision and that he could not guide him one way or the other. After a brief discussion, Malloch said, "I'll talk."

Detective Lauer was not accusatory during this second interview. Malloch said that he had "not good thoughts" about C.P. since 2003. He then admitted he was awake and consciously fingered C.P.:

MR. MALLOCH: But, it happened to be—yeah, I didn't want to hurt her, she happened to be asleep, and I failed to control myself.

DETECTIVE: So, can you tell me then what happened that particular day?

MR. MALLOCH: I remember—yeah, laying down—falling asleep, waking up, and this has come to me as I'm laying out there, put my—curious, or whatever, put my hand down there, she stirred, pulled my hand out, and then had gotten kicked out of the bed.

*Malloch*, 980 N.E.2d at 892-93 (internal citations omitted).

In rejecting Malloch's challenge to the voluntariness of his confession, the Indiana Court of Appeals properly identified the totality of the circumstances test as the governing standard.[2] *Id.* at 901. The court observed that at the time of these two interviews Malloch was 35-years-old, had a degree in architectural engineering, and worked as a network engineer. *Id.* at 902. Before each interview, he was read his *Miranda* rights and signed a form indicating that he understood them. *Id.* Detective Lauer made no specific promises in order to obtain his confession. *Id.* Although the first interview was sometimes "confrontational and intense in light of the serious offenses being investigated," the court concluded that the totality of the circumstances showed his statements had been made voluntarily. *Id.*

The court has reviewed the transcripts and video recordings of the two interviews (ECF 7-3 at 192-251; ECF 7-4 at 1-39; ECF 14), and concludes that the state court's decision is amply supported by the record and does not involve an unreasonable

---

[2] The Indiana Court of Appeals cited to state case law in setting forth the governing standards, but under AEDPA a state court need not cite to or even be aware of applicable Supreme Court case law, "so long as neither the reasoning nor the result of the state-court decision contradicts" Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002). The standard employed by Indiana Court of Appeals is in accord with Supreme Court precedent.

application of Supreme Court precedent. As outlined by the state court, at the time of these interviews Malloch was an adult man in his 30s who was educated, worked in a professional job, and had no specific vulnerabilities. He was given *Miranda* warnings two times and signed two waivers indicating that he understood his rights and wished to speak with Detective Lauer.

Contrary to his argument, Detective Lauer did not coerce him into saying he was awake or tell him what to say; the detective simply reiterated several times that he did not believe his account that he was sleeping during this incident. Detective Lauer also told Malloch that his investigation showed Malloch was awake during this incident, but police telling a suspect that they "already knew what had happened when in fact they did not" is a common interview technique that does not render a confession involuntary. *Dassey*, 877 F.3d at 304.

The first interview lasted roughly an hour and 25 minutes, with the first 30 minutes or so consisting of general questions. The more accusatory portion of the interview lasted roughly an hour, during which time Malloch was given water and tissues when he requested them. Detective Lauer did not raise his voice or threaten Malloch. After the interview ended, Malloch was held at the jail for approximately four hours—from roughly 7 p.m. to 11:00 p.m.—during which time he was permitted to take a shower and make telephone calls. (ECF 5-2 at 108-121; ECF 5-6 at 8.) There is no indication he was deprived of sleep or food during his brief detention.

The second interview was initiated at Malloch's request and as soon as it was underway, Malloch admitted to being awake during the incident with C.P.[3] He stated clearly and deliberately that he had been having "not good thoughts" about C.P. for years and wanted to "get help." (ECF 7-4 at 18.) He explained that he had fallen asleep with C.P., woke up "aroused," and put his finger in C.P.'s vagina because he was "curious" and "failed to control [him]self." (*Id.* at 18-19, 21.) The second interview lasted just over 30 minutes, and at the end of it Malloch shook Detective Lauer's hand and thanked him before returning to the jail. The record does not show that Detective Lauer coerced Malloch into confessing.

The record further reflects that Detective Lauer did not make Malloch any false promises of leniency during either interview. Malloch suggests that he thought he might be permitted to go free if he confessed, but a review of the transcripts and video shows that Detective Lauer never told him as much. Detective Lauer made a number of statements about needing to know what happened and needing to be satisfied that Malloch accepted responsibility for his actions. However, none of these statements promised Malloch any type of leniency or suggested Malloch could walk out of the police station a free man if he confessed. Indeed, at the start of the second interview

---

[3] Although Malloch does not clearly articulate this argument in his petition, he argued in the state proceedings that his statements during the second interview were involuntary because Detective Lauer intentionally placed him with an accused murderer at the jail. *Malloch*, 980 N.E.2d at 903-04. To the extent he is raising that argument here, it is belied by the record. The record reflects that Detective Lauer had nothing to do with his placement at the jail. *Id.* Additionally, Malloch was in a cell 20 feet from the jail officer's desk the entire time and was closely monitored. *Id.* at 896. At no point did the officer in charge have any indication that Malloch felt threatened by anyone. Malloch also did not mention feeling threatened to Detective Lauer at any point during the second interview, including when he left the detective's office to return to the jail. (*See* ECF 7-4 at 15-39.)

Malloch inquired about going home that night, and Detective Lauer made clear this was not possible no matter what Malloch said at the interview.[4] (ECF 7-4 at 16.)

At most, Detective Lauer suggested that Malloch had a better chance for leniency if he accepted responsibility for his actions, which was not improper. *Dassey*, 877 F.3d at 304 ("[T]he Supreme Court allows police interrogators to tell a suspect that 'a cooperative attitude' would be to his benefit."). Malloch's subjective desire to convince Detective Lauer that he was a good person and not a serial child molester does not make Detective Lauer's questioning improper; the officer merely used effective interview techniques to get Malloch to admit to what he did. *Dassey*, 877 F.3d at 304 ("officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff"); *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990) ("The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties[.]").

To the extent Malloch claims that Detective Lauer coerced him into writing the apology letter to C.P., this is also undercut by the record. Although the idea of writing a letter was initially suggested by Detective Lauer, Malloch quickly agreed, and the detective did not tell Malloch what to write or otherwise involve himself in the letter. Instead, the video of this portion of the interview shows Detective Lauer handing Malloch paper and pens and then turning the other direction to work at his computer

---

[4] Malloch was hoping to attend his son's birthday party scheduled that weekend, but he admitted at trial that after asking Detective Lauer about it he understood that his going home was "off the table." (ECF 5-4 at 113.)

while Malloch drafted the letter. Based on the record, the state court's rejection of this claim was not objectively unreasonable. The claim is denied.

      B.      Ineffective Assistance of Counsel

Malloch next claims that his retained trial attorney, John Bohdan, was ineffective on three grounds: (1) failing to present expert testimony on false confessions and sexsomnia; (2) failing to object to alleged improper comments by the prosecutor; and (3) failing to "explore possible juror bias." (ECF 1 at 2.) The Respondent argues that grounds two and three are procedurally defaulted and, alternatively, that all three grounds fail on the merits. (ECF 4 at 25-49.)

Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009). To prevail on a claim of ineffective assistance, the petitioner must show that counsel's performance was deficient and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices[.]" *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Gilbreath v. Winkleski*, 21 F.4th 965, 981 (7th Cir. 2021). The court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a federal habeas proceeding: "[T]he

question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Furthermore, the court must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011). An attorney's representation "need not be perfect, indeed not even very good, to be constitutionally adequate." *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017). Rather, "[i]t must merely be reasonably competent." *Id.*

Counsel is also afforded significant discretion in selecting a trial strategy based on the information known at the time. *Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Gilbreath*, 21 F.4th at 982. Additionally, if the defendant wanted counsel to raise an argument that had no merit, an ineffective-assistance claim cannot succeed, because "[c]ounsel is not ineffective for failing to raise meritless claims." *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013); *see also Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Gilbreath*, 21 F.4th at 981 (citation omitted). In assessing prejudice

under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Harrington*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

The record reflects that Attorney Bohdan had been practicing criminal law for 20 years at the time of Malloch's trial.[5] (ECF 5-11 at 158-59.) He handled approximately 250 criminal trials, including two prior cases involving parasomnia behaviors. (*Id.* at 160.) The record reflects that counsel was well-prepared and vigorously represented Malloch's interests throughout the criminal proceeding. Among other things, he conducted pretrial discovery, filed and argued several pretrial motions, actively participated in jury selection, gave an opening statement, vigorously cross-examined the state's witnesses, presented the testimony of witnesses for the defense, participated in the jury instruction conference, and gave a compelling closing argument.[6] (*See* ECF 5-2; ECF 5-3; ECF 5-4; ECF 5-5.) With this background in mind, the court turns to the specific errors asserted by Malloch.

      1.      Presentation of Experts

Malloch first claims Attorney Bohdan was ineffective in failing to present testimony from experts on false confessions and sexsomnia. In rejecting these

---

[5] By the time of the post-conviction hearing, Attorney Bohdan had become a magistrate judge in Allen County. (ECF 5-11 at 158-59.)

[6] Malloch retained a different attorney to represent him at sentencing. (ECF 5-5 at 39; ECF 5-8 at 87.)

arguments on post-conviction review, the Indiana Court of Appeals properly identified *Strickland* as the governing standard. *Malloch*, 223 N.E.3d at 696-97. The court concluded that Attorney Bohdan was not deficient in failing to present expert testimony and instead had acted reasonably in connection with this issue. *Id.*

The state court's conclusion is amply supported by the record and does not involve an objectively unreasonable application of *Strickland.* As for retaining an expert on false confessions, the record reflects that Attorney Bohdan was well aware of the potential for attacking Malloch's inculpatory statements to Detective Lauer and consulted with two experts on false confessions prior to trial. (ECF 5-11 at 153.) He then used the information he learned as a foundation of his defense, placing before the jury the theory that Malloch's confession was false and the result of undue police pressure. He did this through his direct examination of Malloch, his cross-examination of Detective Lauer, and in his arguments. He did not present testimony from an expert witness on false confessions generally, which he thought was an unusual step that he had not seen in his many years of criminal practice. (ECF 5-11 at 160.) However, he used the knowledge he gained from the experts to argue to the jury that Malloch's confession was not voluntary. This was a reasonable strategic decision under the circumstances.

Malloch also hasn't shown that had counsel retained an expert on false confessions, there is a reasonable likelihood the result of the proceeding would have been different. The expert who testified at Malloch's post-conviction hearing acknowledged that she "never" offers an opinion about whether a particular confession is false and had not done so in Malloch's case. (ECF 5-11 at 134.) She further

22

acknowledged that most convictions involve "vulnerable" individuals, such as the mentally ill, children, or the developmentally disabled. (ECF 5-11 at 133.) She acknowledged that individuals like Malloch, an educated professional free of mental illness and other impairments, are "statistically . . . less vulnerable" to police coercion. (*Id.*) A jury hearing testimony from this expert would thus have been faced with the same proposition that common sense dictated: that it would have been unusual for someone like Malloch to collapse under police pressure and admit to doing something he did not do.

Furthermore, this expert testified that many false confessions occur because the defendant feels a "need to escape" from an interrogation and that "people become willing to say anything to get out of there." (ECF 5-11 at 71.) Here Malloch's confession came during the second interview, which *he* initiated and which was not accusatorial. As soon as the interview was underway, Malloch admitted without prompting from Detective Lauer that he had been having sexual thoughts about C.P. for years and knowingly put his finger in her vagina while she was sleeping because he could not control himself. The state court reasonably determined that Attorney Bohdan was not ineffective on this ground.

As for the expert on sexsomnia, the record shows that Attorney Bohdan consulted two experts on sexsomnia prior to trial.[7] The first expert declined to testify for the defense after reviewing Malloch's statements to police admitting to touching C.P.'s

---

[7] It appears it was Malloch who first identified sexsomnia as a potential defense after watching a "program on Discovery Health." (ECF 7-4 at 121.)

breasts because he was curious and equivocating about whether he was awake when he put his finger in her vagina. *Malloch*, 223 N.E.3d at 695-96, 699. Counsel could have asked this doctor to testify generally about sexsomnia, but that had the potential to damage Malloch's defense, as the doctor appeared to question whether Malloch suffered from sexsomnia. In fact, this was the same expert called as a witness by Malloch's attorneys during the post-conviction evidentiary hearing, and the expert continued to voice concerns about Malloch's equivocal statements to police, which he found inconsistent with a sexsomnia diagnosis.

Attorney Bohdan consulted with a second expert, Dr. Neeraj Kaplish, a medical doctor and professor at University of Michigan specializing in sleep medicine, who conducted testing of Malloch after he was arrested. (ECF 7-4 at 45-101, 115-20.) Dr. Kaplish determined that Malloch suffered from sleep apnea, which in the doctor's view was "suggestive for a parasomnia consistent with sexsomnia." (*Id.* at 122.) However, this expert was "not terribly cooperative" with defense counsel during pretrial proceedings and was also represented by his own attorney who was "running interference" in the case. (ECF 5-11 at 156.) In Attorney Bohdan's assessment, Dr. Kaplish also made statements at his pretrial deposition which "did not steadfastly hold to his sexsomnia diagnosis." *Malloch*, 223 N.E.3d at 700. Importantly, Dr. Kaplish acknowledged at his deposition that his diagnosis was based on Malloch's personal account of what happened with C.P. *Id.* He acknowledged that his diagnosis could be incorrect if Malloch had lied to him. *Id.* at 691. He also revealed that he had only diagnosed one patient with this disorder—Malloch—and provided weak testimony

24

about his knowledge of the disorder, answering, "I don't know," to many questions posed by the attorneys. (ECF 7-4 at 45-101.) Additionally, Dr. Kaplish was not available on the dates of Malloch's second trial. *Malloch*, 223 N.E.3d at 691. Attorney Bohdan attempted to obtain a continuance so that Dr. Kaplish could testify, but his request was denied.[8] *Id.* at 691-92.

Attorney Bohdan thus made a reasonable, albeit unsuccessful, attempt to secure an expert on sexsomnia to support Malloch's defense. Despite his inability to present an expert on this issue, it is evident that counsel used the information he gained from these experts to inform his actions during the trial. He argued in his opening statement that the evidence would show Malloch was asleep when he molested C.P., which he argued meant that his actions were not "knowing" and "intentional" within the meaning of Indiana law. *Id.* He introduced evidence, both through Malloch and his wife, that he sometimes touched her in a sexual manner while he was sleeping. *Id.* He also questioned C.P. to elicit testimony that Malloch appeared to be asleep during this incident. *Id.* Counsel was also able to present the jury with information reflecting that

---

[8] Dr. Kaplish was not a witness at the first trial, but after that trial ended in a hung jury Attorney Bohdan made the determination that he wanted to call Dr. Kaplish as a witness at the second trial. The record reflects that counsel worked quickly to have this witness' deposition completed during the 90 days between the first and second trial and to subpoena him as a witness. (ECF 5-2 at 186-87.) However, Dr. Kaplish contacted counsel a few days before the second trial was scheduled to begin and said he would not be available. (*Id.* at 187.) Dr. Kaplish was a resident of Michigan, making it more difficult to compel his appearance at an Indiana proceeding, but the record reflects that Attorney Bohdan researched how to subpoena this out-of-state witness and did in fact subpoena him, but it appears Dr. Kaplish intended to simply ignore the subpoena. (*Id.* at 204-10; ECF 5-16 at 139.) Malloch suggests that the court denied his request for a continuance because of problems with the subpoena, but the trial judge did not rule on whether the subpoena was enforceable; he merely determined that he would not move the trial date given the age of the case. (*See* ECF 5-2 at 186-211.) Assuming there was some problem with the subpoena, it is worth noting that an attorney "need not be perfect, indeed not even very good, to be constitutionally adequate." *Delatorre*, 847 F.3d at 845.

sexsomnia is a real condition and that Malloch had been diagnosed with this condition

by Dr. Kaplish. In some ways this was actually preferable to Dr. Kaplish testifying,

because the doctor likely would have been subject to vigorous cross-examination by the

prosecutor based on his equivocations during his pretrial deposition.[9]

Furthermore, based on counsel's presentation of this issue, the jury appears to

have accepted that sexsomnia is a real disorder. After Malloch testified, the jury was

permitted to submit their own questions, and they asked a number of questions about

the signs, symptoms, and triggers of sexsomnia. (ECF 5-4 at 120-23.) Malloch was

permitted to provide additional testimony responding to these questions. (*Id.*)

Ultimately, Malloch's sexsomnia defense was not successful, but the record reflects that

counsel was not deficient in connection with his presentation of this issue. Given the

evidence in the record, Malloch also has not demonstrated that had counsel performed

differently on this issue, there is a reasonable likelihood that the result of the proceeding

would have been different. The state court's rejection of this claim was not objectively

unreasonable.

2.       Exploring Juror Bias

Malloch next argues that Attorney Bohdan did not adequately explore during

*voir dire* whether prospective jurors knew someone who had been sexually abused or

---

[9] The prosecutor stated during a pretrial hearing that she decided not to challenge the admissibility of Dr. Kaplish's testimony because in her view, "he's such a bad witness the state would be better off to let the Defendant call him and tear him apart[.]" (ECF 5-2 at 192.)

had been the victim of sexual abuse themselves. (ECF 1 at 3.) The Respondent argues

that this claim is procedurally defaulted. (ECF 4 at 41-42.)

Before considering the merits of a claim contained in a habeas petition, the court

must ensure that the petitioner has exhausted all available remedies in state court with

respect to that claim. 28 U.S.C. § 2254(b)(1)(A); *Hoglund*, 959 F.3d at 832. The exhaustion

requirement is premised on a recognition that the state courts must be given the first

opportunity to address and correct violations of their prisoners' federal rights. *Davila v.*

*Davis*, 582 U.S. 521, 528 (2017); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). For that

opportunity to be meaningful, the petitioner must fairly present his constitutional claim

in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004);

*Boerckel*, 526 U.S. at 845. This includes seeking discretionary review in the state court of

last resort. *Boerckel*, 526 U.S. at 848. The companion procedural default doctrine, also

rooted in comity concerns, precludes a federal court from reaching the merits of a claim

when the claim was presented to the state courts and denied on the basis of an adequate

and independent state procedural ground, or when the claim was not presented to the

state courts and the time for doing so has passed. *Davila*, 582 U.S. at 528; *Coleman v.*

*Thompson*, 501 U.S. 722, 735 (1991).

As the Respondent points out, Malloch raised this claim before the post-

conviction court, but he did not raise a claim on post-conviction appeal about Attorney

Bohdan's performance related to questioning potential jurors. Although he raised other

grounds of ineffective-assistance of counsel, each ground is considered separate for

exhaustion purposes. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) (where

petitioner complained about one aspect of counsel's performance in state proceeding but not the specific error he was challenging in federal habeas petition, claim was procedurally defaulted). Because he did not present this claim at each level of state review and the time for doing so has passed, the claim is procedurally defaulted. *Davila*, 582 U.S. at 528.

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and resulting prejudice. *Davila*, 582 U.S. at 528. "Cause" in this context means "an objective factor external to the defense that impeded the presentation of the claim to the state courts." *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018) (citation and internal quotation marks omitted). A petitioner establishes prejudice if they show "not merely a substantial federal claim, such that the errors at trial created a possibility of prejudice, but rather that the constitutional violation worked to [their] actual and substantial disadvantage." *Shinn v. Ramirez*, 596 U.S. 366, 379–80 (2022). A habeas petitioner can also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice because they are actually innocent. *House v. Bell*, 547 U.S. 518, 536 (2006).

Malloch does not respond to the procedural default argument in his traverse. (ECF 17.) In his petition, he suggests that he did not present this claim to the state courts because of "space constraints" governing his brief to the Indiana Court of Appeals. (ECF 1 at 4.) His decision to omit this claim from his brief in order to focus on other claims is not the type of external factor that would excuse his failure to present the

claim to the Indiana Court of Appeals.[10] *Crutchfield*, 910 F.3d at 973 ("cause" in this context only applies to factors that "cannot fairly be attributed to the prisoner"). Additionally, the exhaustion doctrine requires that a claim be raised "at each and every level in the state court system," *Boerckel*, 526 U.S. at 845, and Malloch did not include this claim in his petition to transfer to the Indiana Supreme Court either. (ECF 4-14.) He does not provide any reason for his default at that level, and has not established a basis to set aside his procedural default of this claim.

Assuming for the sake of argument he could overcome the default, the Respondent alternatively argues that this claim fails on the merits. (ECF 4 at 42-45.) The Sixth and Fourteenth Amendments encompass the right to an impartial jury. *Morgan v. Illinois*, 504 U.S 719, 727 (1992). This right consists of finding jurors "who will conscientiously apply the law and find the facts." *Wainwright v. Witt*, 469 U.S. 412, 423 (1985). A prospective juror may be excluded if the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Morgan*, 504 U.S. at 729. Part of the right to an impartial jury includes the right to conduct an adequate *voir dire* of prospective jurors. *Id*. However, there is no "hard-and-fast formula" dictating "the necessary depth or breadth of *voir*

---

[10] The court is cognizant that Malloch was represented by retained counsel in the post-conviction proceedings, who prepared the brief in question. Errors by post-conviction counsel generally do not provide cause to set aside a default. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). The Supreme Court has carved out an exception wherein ineffective assistance by post-conviction counsel may provide cause to set aside the default of a claim of ineffective assistance of trial counsel. *Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). However, this exception only applies at the initial post-conviction level and does not apply to errors committed by post-conviction counsel on appeal. *See Martinez*, 566 U.S. at 16. Additionally, Malloch did not exhaust any claim about post-conviction counsel's performance in the state proceedings, a prerequisite to asserting it as cause to excuse a procedural default in federal court. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).

dire." *Skilling v. United States*, 561 U.S. 358, 386 (2010); *see also Morgan*, 504 U.S. at 729

("The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the

defendant be afforded an impartial jury."). Additionally, jurors "need not enter the box

with empty heads in order to determine the facts impartially." *Skilling*, 561 U.S. at 398.

Instead, it is enough "if the jurors can lay aside their impressions or opinions and

render a verdict based on the evidence presented in court." *Id.* at 398-99 (internal

alteration and citation omitted).

The trial record reflects that there was a lengthy jury selection process in this

case, and that Attorney Bohdan took an active role in it. (*See* ECF 5-2 at 213-50; ECF 5-3

at 1-78.) He asked questions of numerous potential jurors to explore their ability to

impartially judge the facts of this sensitive case, which involved an act of sexual abuse

against an 11 year old girl. He also asked questions to determine whether jurors would

be open to Malloch's defense that he made a false confession and was asleep when the

incident occurred. Given the unusual nature of the sexsomnia defense, this was no

small task. Counsel also asked open-ended questions to identify prospective jurors who

felt they would have difficulty deciding the case fairly given their own personal

experiences. The prosecutor likewise asked open-ended questions of prospective jurors

directed at obtaining this same information, and Attorney Bohdan was present to hear

their answers. In response to the questions posed by the attorneys, several potential

jurors stated that they or someone close to them had been the victim of sexual abuse.

(ECF 5-11 at 126; ECF 5-3 at 39, 56.) Some of these potential jurors were questioned in

more detail by the prosecutor, and Attorney Bohdan asked specific questions of other

potential jurors, including asking them directly whether they could be fair and impartial. Some of these individuals ultimately were not selected to serve on the jury. (ECF 5-3 at 51-72.)

The record thus reflects that Attorney Bohdan performed competently during jury selection.[11] Malloch does not identify what additional questions his counsel should have asked, nor has he explained how answers given might have supported removing any potential jurors for cause or a different use of peremptory challenges. He was not entitled to jurors with "empty heads" or no prior exposure to sexual abuse, *Skilling*, 561 U.S. at 386, and there is nothing in the record to suggest that the jurors who served were not impartial. To the contrary, the record reflects that the jurors performed their duties conscientiously. They asked questions of witnesses when given the opportunity and deliberated for several hours before reaching a verdict, even asking to re-watch the 90-minute video of Malloch's first interview with Detective Lauer in its entirety during their deliberations. (*See* ECF 5-5 at 30.) Malloch has not demonstrated deficient performance by Attorney Bohdan or resulting prejudice. The state court's resolution of this claim was not objectively unreasonable.

3.    Objecting to the Prosecutor's Comments

---

[11] It appears that Malloch made the process of jury selection more complicated by his own actions. Shortly before the second trial began, Malloch paid a publication called the "U.S. Observer" to investigate his case; the investigation culminated in an article entitled, "A Dekalb County Nightmare: *Innocent Man Faces 2nd Trial*" which accused C.P. of making false allegations and referred to Malloch's prosecution as "political persecution." (*See* ECF 7-4 at 170; *see also* ECF 5-5 at 82, 86-89.) The article was mailed to individuals throughout the county shortly before Malloch's second trial, and several members of the jury pool acknowledged receiving the article before they reported for jury service. (ECF 5-11 at 167; ECF 7-1 at 11-12.) This article was a focus of the attorneys' attention during *voir dire*.

Malloch next argues that counsel was ineffective in failing to object to comments by the prosecutor that were "inflammatory and improper." (ECF 1 at 3.) The Respondent argues that this claim is also procedurally defaulted. (ECF 4 at 45.)

As the Respondent correctly points out, Malloch did not raise a claim in the post-conviction proceedings about Attorney Bohdan failing to object to comments by the prosecutor. Although he raised other grounds of ineffective-assistance of counsel, each ground is considered separate for exhaustion purposes. *Stevens*, 489 F.3d at 894; *see also Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017) (to fairly present a claim to the state courts, the "petitioner must place before the state court both the controlling law and the operative facts" supporting the claim). Because he did not present this claim to the state courts and the time for doing so has passed, the claim is procedurally defaulted. *Davila*, 582 U.S. at 528.

Malloch does not respond to the Respondent's procedural default argument in his traverse, but he again appears to state in his petition that he could not present this claim to the state appellate court because of "space constraints." (ECF 1 at 4.) His decision to omit this claim and focus on others in his brief to the Indiana Court of Appeals is not the type of external factor that would excuse his default. *Crutchfield*, 910 F.3d at 973. Additionally, a second level of default occurred when he omitted this claim from his petition to transfer to the Indiana Supreme Court (ECF 4-14), and he does not provide any reason for his failure to do so. He has not established grounds to set aside his procedural default.

Assuming for the sake of argument he could overcome the default, the Respondent alternatively argues that this claim fails on the merits. (ECF 4 at 45-49.) The Indiana Court of Appeals had an opportunity to consider the prosecutor's comments in connection with Malloch's claim on direct appeal that he was deprived of a fair trial due to misconduct by the prosecutor. The court concluded that the bulk of the comments he pointed to were not improper and were instead fair comments on the evidence. *Malloch*, 980 N.E.2d at 906-11. The court concluded that the prosecutor may have crossed the line in her rebuttal closing argument when she suggested that "no one" would falsely confess in a child molestation case. *Id.* at 909. The court nevertheless determined that her comments were isolated and brief, and coupled with the fact that the jury had been specifically instructed that the arguments of counsel were not evidence, they did not deprive him of a fair trial. *Id.*

To establish ineffective assistance, a habeas petitioner must overcome the presumption that "the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quote marks and citation omitted). Malloch's post-conviction attorney did not develop this claim at the post-conviction hearing, even though Attorney Bohdan testified and could have been asked about the prosecutor's comments. However, courts have recognized that there are a number of reasons why an attorney would reasonably decline to object to comments by a prosecutor, including that it may end up drawing more attention to the comments than saying nothing. *Lambert v. McBride*, 365 F.3d 557, 564 (7th Cir. 2004); *see also Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003) ("A competent trial strategy frequently is to mitigate

33

damaging evidence by allowing it to come in without drawing additional attention to it, such as an objection would."). Here the comments were made during the state's rebuttal argument, at a point when Attorney Bohdan had no opportunity to respond to them. It was not unreasonable for him to simply let her brief comment pass without drawing additional attention to it. Based on Attorney Bohdan's extensive experience and attentive performance throughout the trial, Malloch has not overcome the presumption that his decision not to object to the prosecutor's comments amounted to sound trial strategy.

Malloch also has not demonstrated that if Attorney Bohdan had objected to these comments, there is a reasonable likelihood that the result of the proceeding would have been different. The Indiana Court of Appeals concluded that the bulk of the comments Malloch pointed to were not objectionable under Indiana law, and this finding is binding in this proceeding. *Earls v. McCaughtry*, 379 F.3d 489, 495 (7th Cir. 2004) (a federal habeas court has no authority to "second-guess state courts in interpreting state law"). There can be no prejudice when counsel did not raise an argument that would have been unavailing. *Stone*, 86 F.3d at 717.

As to the prosecutor's comment about false confessions, the jurors were specifically instructed that the arguments of counsel were not evidence. *Malloch*, 980 N.E.2d at 909. They appeared to take this admonition seriously. During their deliberations, they asked to review the entire 90-minute video of Malloch's first interview with Detective Lauer, suggesting they understand that whether Malloch's confession was voluntary was a central issue for them to decide. Even if this claim were

not defaulted, Malloch has not demonstrated deficient performance or resulting prejudice. This claim is denied.

C.     Denial of Counsel

Malloch next claims that he was denied his Sixth Amendment right to counsel during the second interview with Detective Lauer. (ECF 1 at 4.) Specifically, he claims that he invoked his right to counsel in response to Detective Lauer's *Miranda* warning, and that the interview should have ended at that point. (*Id.*) The Respondent argues that this claim is procedurally defaulted. (ECF 4 at 49.) As the Respondent points out, Malloch presented this claim to the Indiana Court of Appeals on direct appeal, but he did not include it in his petition to transfer to the Indiana Supreme Court. (ECF 4-7.) Because he did not present this claim at each level of state review and the time for doing so has passed, the claim is procedurally defaulted. *Davila*, 582 U.S. at 528.

He appears to blame his appellate attorney for the default. (ECF 1 at 4.) Attorney error rising to the level of a Sixth Amendment violation can provide cause to excuse a procedural default. *Davila*, 582 U.S. at 528. Here, however, the default occurred at a stage when Malloch did not have a right to counsel, as there is no Sixth Amendment right to counsel to seek discretionary review with a state Supreme Court. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Wainwright v. Torna*, 455 U.S. 586, 587 (1982). Where

there is no constitutional right to counsel, attorney error cannot supply cause to excuse a procedural default.[12] *Davila*, 582 U.S. at 529; *Coleman*, 501 U.S. at 752.

Assuming he could overcome the default of this claim, the Respondent alternatively argues that it fails on the merits. (ECF 4 at 49-52.) To safeguard the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel, an individual questioned while in police custody is given certain warnings under *Miranda v. State of Arizona*, 384 U.S. 436, 479 (1966). This includes "the right to consult with an attorney and to have counsel present during questioning." *Davis v. United States*, 512 U.S. 452, 457 (1994) (citing *Miranda*, 384 U.S. at 469–73). If a suspect waives his rights after receiving the *Miranda* warnings, the police are free to question him. *North Carolina v. Butler*, 441 U.S. 369, 372–376 (1979). However, if a suspect requests counsel, then he is not subject to further questioning until a lawyer has been made available or until the suspect himself reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). This rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis*, 512 U.S. at 458 (citations omitted.) Thus, "a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present." *Id.*

Whether the "rigid prophylactic rule" of *Edwards* applies requires courts to determine "whether the accused actually invoked his right to counsel." *Davis*, 512 U.S.

---

[12] Malloch also did not exhaust any claim about his appellate attorney's performance in the state proceedings, a necessary prerequisite to using the claim to establish cause for his default. *Edwards*, 529 U.S. at 452.

at 458. This is judged by an objective standard. *Id.* The court must consider "the circumstances in which the statement was made as well as the words employed." *United States v. Wysinger*, 683 F.3d 784, 794 (7th Cir. 2012). Invocation of the *Miranda* right to counsel must be unambiguous. *Davis*, 512 U.S. at 459. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the officer is not required to stop his questioning. *Id.* (emphasis in original). When the officer conducting the interview "reasonably do[es] not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity." *Id.* (citation and internal quotation marks omitted).

In rejecting Malloch's claim that Detective Lauer violated his right to counsel, the Indiana Court of Appeals properly identified *Miranda* and *Davis* as the governing standard. *Malloch*, 980 N.E.2d at 899-900. The court concluded that Malloch did not unequivocally invoke his right to counsel before the second interview. *Id.* at 900-01. This conclusion is amply supported by the record and does not involve an unreasonable application of Supreme Court precedent.

The record reflects that prior to the start of the first interview, Detective Lauer advised Malloch of his *Miranda* rights, including giving him the following warning:

> You have the right to talk to a lawyer and have him present with you
> while you're being questioned. If you cannot afford to hire a lawyer one
> will be appointed to represent you at County expense before questioning,

if you wish. If you give up your right to remain silent and later wish to
stop answering questions, no further questions will be asked.

*Malloch*, 980 N.E.2d at 899. Malloch stated that he understood these rights and had no

questions about them. *Id.* at 900. He also signed a written waiver acknowledging that he

understood his rights and wished to speak with Detective Lauer. *Id.* at 900-02.

Before the second interview, which occurred at Malloch's request only about four

hours later, Detective Lauer read him his *Miranda* rights a second time. In pertinent

part, he advised him again: "You have the right to talk [to] a lawyer and have him

present with you while you're being questioned. If you cannot afford to hire a lawyer,

one will be appointed to represent you at County expense before questioning, if you

wish." (ECF 7-4 at 16.) Detective Lauer asked if he understood his rights and Malloch

responded, "Uh-huh." The following exchange then occurred:

> MALLOCH: I—is it—this is what I wanted to ask you when you
> initially came down. Is it best advised to speak to a lawyer?
>
> DETECTIVE: I can't answer that for you, that's a decision that you
> have to—I can't guide you one way or the other on that.

The two sat in silence for approximately a minute. The conversation then continued:

> DETECTIVE: Did you talk to your wife, at all?
>
> MALLOCH: Yes. Yeah, and I—I asked her to—you know, to get a hold
> of an attorney. But I just—
>
> DETECTIVE: You just can't really do that on a Friday night.
>
> MALLOCH: Well, right. And, I—I just—I—stuff's—I—I—I guess I
> really shouldn't should I—I mean, if—either I'm gonna talk, or I'm not
> talk, right. I mean—
>
> DETECTIVE: Yeah, either you're gonna, or you're not. I mean, you—

> you've, in essence, told what happened—
>
> MALLOCH: Right.
>
> DETECTIVE: —I mean, we're just that far away. But you're—it's your decision, your call.

The two sat in silence again as Malloch pondered what to do before stating, "I'll talk." (ECF 7-4 at 16-17.) He signed a second waiver indicating that he understood his rights and wished to speak with Detective Lauer. (*Id.* at 17.)

Based on the record, Malloch's question "is it best advised to speak to a lawyer" did not unambiguously invoke his right to counsel. He did not state that he wanted to consult an attorney before speaking with Detective Lauer or that he wanted an attorney present during the interview. *See Davis*, 512 U.S. at 455 (defendant's statement "maybe I should talk to a lawyer" was not an unambiguous request for counsel); *see also Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 444−45 (7th Cir. 2020) (defendant's question "how can I … get an attorney here" was not an unambiguous request for counsel). The suspect must communicate a "present desire to consult with an attorney," and Malloch's statement did not do that. *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994) (the question, "is there any way I can get [a lawyer]?" did not unambiguously invoke right to counsel).

When Malloch made this equivocal statement, Detective Lauer appropriately responded that he could not make the decision for him or offer him any advice. After the two sat in silence for approximately a minute, Detective Lauer asked him whether he had been able to speak with his wife since his arrest. Malloch stated that he told his

wife to try to find him an attorney. It may have been best practice for Detective Lauer not to have commented about the difficulty of finding an attorney, but understood in context, the detective appeared to be pointing out that Malloch's wife might have difficulty reaching an attorney late on a Friday night. He did not suggest that the interview should proceed without counsel, or that Malloch was required to speak with him before consulting an attorney. Indeed, he did not suggest that Malloch was required to speak with him at all. The detective sat quietly while Malloch pondered the matter further before stating definitively, "I'll talk." (ECF 7-4 at 17.)

The record thus shows that Malloch did not unequivocally invoke his right to counsel. Furthermore, he reinitiated the conversation with Detective Lauer after asking the equivocal question about whether it was "best advised" to consult with an attorney, also signing a written waiver of his rights and stating in clear terms that he wished to talk to Detective Lauer. "[T]he law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010). Even if this claim were not defaulted, Malloch has not shown that the state court's rejection of this claim was objectively unreasonable. Claim three is denied.

D.    Juror Misconduct

In his final claim, Malloch argues that he was "denied his right to a fair trial due to gross juror misconduct." (ECF 1 at 4.) Specifically, he claims that several jurors "lied"

on their questionnaires and during *voir dire*. (*Id*.) The Respondent argues that this claim is procedurally defaulted. (ECF 4 at 52.)

The record reflects that Malloch raised a claim about juror misconduct in his post-conviction petition, but he did not present this claim to either the Indiana Court of Appeals or the Indiana Supreme Court. (*See* ECF 4-10; ECF 4-14.) Because he did not present this claim at each level of state review and the time for doing so has passed, the claim is procedurally defaulted. *Davila*, 582 U.S. at 528.

Malloch appears to blame his post-conviction attorney for the default. (ECF 1 at 4.) As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause" to set aside a procedural default. *Maples v. Thomas*, 565 U.S. 266, 280 (2012). The Supreme Court has recognized an exception wherein ineffective assistance by post-conviction counsel may provide cause to set aside the default of a claim of ineffective assistance of trial counsel. *Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). This so-called *Martinez-Trevino* exception applies to prisoners in Indiana. *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017). However, it is no benefit to Malloch, because *Martinez-Trevino* applies solely to review of defaulted claims of ineffective assistance of trial counsel, not to other types of defaulted claims. *Davila*, 582 U.S. at 529-30. In other words, alleged errors by post-conviction counsel cannot be used to obtain review of a defaulted claim about juror misconduct. He has not provided cause to set aside his default.

Assuming for the sake of argument he could overcome the default, the Respondent alternatively argues that this claim fails on the merits. (ECF 4 at 53-63.) As

outlined earlier in the opinion, the Constitution guarantees the accused the right to an impartial jury. *Morgan*, 504 U.S at 727. This right consists of finding jurors "who will conscientiously apply the law and find the facts." *Wainwright*, 469 U.S. at 423. Jurors need not be perfect or have "empty heads" to be considered impartial. *Skilling*, 561 U.S. at 398. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

There was a rigorous jury selection process in this case, and both defense counsel and the prosecutor were permitted to question potential jurors at length. Prospective jurors were asked in a variety of ways whether they could fairly decide the case based solely on the evidence, and they all responded that they could. Malloch nevertheless points to information pertaining to a few of the jurors that came to light after his trial was over, which in his view demonstrates that he was denied the right to an impartial jury. However, after hearing these jurors testify at the post-conviction evidentiary hearing, the judge (who also presided over Malloch's trial) found that Malloch failed to prove that "any juror was biased against [him] or lied during Voir Dire or on the completion of any jury questionnaire." *Malloch v. Indiana*, No. 17D02-401-PC-00001 (Dekalb Sup. Ct. order dated Aug. 8, 2022), at 11. This factual finding, which was based on the judge's ability to assess the credibility of these witnesses first-hand, is entitled to deference in this proceeding. 28 U.S.C. § 2254(e); *see also Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984). The record amply supports the judge's conclusion.

The record reflects that Juror L.R.[13] stated she did not have any children when she completed her jury questionnaire. (ECF 7-4 at 183.) She acknowledges at the post-conviction evidentiary hearing that she did in fact have a daughter; however, her daughter was an adult at the time of the trial, and she explained that she did not list her on the questionnaire because she did not live with her. (ECF 5-11 at 194). The post-conviction court reasonably concluded that this was an innocent mistake that did not impact this juror's ability to be impartial.

Juror M.K. stated in his jury questionnaire that he was never charged with a crime and that none of his immediate family members were convicted of a crime. (ECF 7-4 at 185-86). During the post-conviction evidentiary hearing, Malloch's counsel asked this juror if he had been arrested for operating a vehicle while intoxicated in 2003, and he replied that he was not arrested. (ECF 5-11 at 201.) Malloch's counsel then asked this juror if his daughter had been convicted of certain offenses, and he responded that he was not aware of this. (*Id.* at 202.) He acknowledged that his son had been convicted of operating a vehicle while intoxicated, but he believed the conviction occurred after Malloch's trial. (*Id.*) The post-conviction court reasonably concluded that Malloch failed to prove this juror lied during the jury selection process or that he was not impartial.

Juror G.B. stated that none of his immediate family members had been convicted of a crime when he completed his jury questionnaire (ECF 7-4 at 187-88.) During the post-conviction evidentiary hearing, Malloch's counsel asked this juror about several of

---

[13] The court refers to the jurors by their initials in this opinion to protect their privacy.

his family members whom she believed had been convicted of crimes. (ECF 5-11 at 207-08.) Most of the information he said he did not know about, although he acknowledged that his son had been convicted of a traffic-related offense "when he was young,"[14] and was also arrested for a traffic offense sometime in 2011 (whether before or after Malloch's trial was not explored). (*Id.*) This juror testified that he "tried to answer the questions as truthfully as I could," and Malloch's attorney did not present official records to prove up any offenses by his family members to contradict his testimony. (*Id.* at 210-11.) The post-conviction court reasonably concluded that Malloch failed to show this juror lied during jury selection, or that he was not impartial in Malloch's case.

Juror D.G. reported that he had been convicted of felony theft when he completed his jury questionnaire. (ECF 7-4 at 189-90.) He also stated that he did not have any physical or mental impairments that would disqualify him from jury service. (*Id.*) At the post-conviction evidentiary hearing, he admitted that he also had a misdemeanor conviction for check deception around the same time as the theft conviction that he did not list for reasons that were not explored at the hearing. He further acknowledged that after Malloch's trial was over he was charged with an offense in which his counsel filed a notice of mental disease or defect. (ECF 5-11 at 216.) This juror appears to have omitted a misdemeanor offense from his jury questionnaire, but the attorneys and the judge were aware that he had a more serious felony

---

[14] The details of this incident were not explored by Malloch's attorney at the post-conviction hearing, but the court notes that juvenile adjudications are not considered "crimes" under Indiana law. *See Jordan v. State*, 512 N.E.2d 407, 408 (Ind. 1987).

conviction, and he was still permitted to serve. Additionally, this juror could not have

lied on his jury questionnaire about a crime that occurred *after* Malloch's trial ended;

furthermore, public records reflect that D.G. ultimately did not pursue a mental defect

defense in that case and instead pled guilty to the underlying charge. *See State v. D.G.,*

17D02-1202-FB-014 (Dekalb Sup. Ct. closed Nov. 5, 2012.) The record does not show that

this juror lied during the jury selection process, or that he was not impartial in deciding

Malloch's case.

Juror T.D. stated that none of her family members had been convicted of a crime

when she completed her jury questionnaire. (ECF 7-4 at 194-95.) During the evidentiary

hearing, Malloch's counsel asked her whether she was aware that her brother had a

conviction for battery from the 1980s and that her uncle had a criminal history. (ECF 5-

11 at 226.) She testified that she did not know this information. (*Id.*) She was also asked

about the criminal record of a woman she knew through her brother; she testified that

she did not know about this woman's criminal history and that the woman was not

actually related to her. (*Id.* at 228.) She was also asked about a man she had been briefly

married to years earlier, but she explained she "hadn't seen him for forever" and did

not consider him to be a family member. (*Id.* at 229.) The post-conviction court

reasonably concluded that Malloch failed to show that this juror lied during *voir dire*, or

that she was not impartial in Malloch's case.

Based on the record, Malloch has failed to show he was denied his right to an

impartial jury. As the Supreme Court has observed:

> Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently.

*Patton*, 467 U.S. at 1039. To invalidate Malloch's trial because of the minor discrepancies he points to "is to insist on something closer to perfection than our judicial system can be expected to give." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). Even if this claim were not defaulted, it would not entitle him to federal habeas relief.

### H.    Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted).

For the reasons fully explained above, Malloch's claims are procedurally defaulted or without merit under AEDPA standards. The court finds no basis to conclude that reasonable jurists would debate the outcome of the petition or find a reason to encourage him to proceed further. Accordingly, the court declines to issue him a certificate of appealability.

III.    CONCLUSION

For the reasons set forth above, the petition (ECF 1) is DENIED, and the petitioner is DENIED a certificate of appealability. The clerk is DIRECTED to close this case.

SO ORDERED on December 3, 2024.

s/Holly A. Brady_____
CHIEF JUDGE
UNITED STATES DISTRICT COURT